# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**LISA M. BALDE**
        **Plaintiff,**

    **v.**                               **Case No. 10-C-0682**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
              **Defendant.**

---

## DECISION AND ORDER

Plaintiff Lisa Balde applied for disability insurance benefits ("DIB") in 2008, but because her DIB "insured status" expired on March 31, 2005, she had to establish disability prior to that date. Plaintiff experienced significant health problems (related primarily to alcohol abuse) between 1998 and January 2004, but she returned to full-time work in early 2004 (holding that job until October 2004 when she began receiving alimony from her ex-husband) and received little or no further medical treatment until 2008, when she developed more severe medical problems. Based on the absence of evidence of disability during the relevant period, the Social Security Administration ("SSA") denied plaintiff's application, as did an Administrative Law Judge ("ALJ") following a hearing. The SSA's Appeals Council ("AC") remanded the matter for reconsideration of the report of a treating physician, which suggested that plaintiff's problems may have commenced prior to March 31, 2005, but on remand the ALJ rejected the report and again denied the claim. The AC denied plaintiff's renewed request for review, making the ALJ's decision the SSA's final determination on the application. See Getch v. Astrue, 539 F.3d 473, 480 (7th Cir. 2008). Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

# I. APPLICABLE LEGAL STANDARDS

## A.    Disability Standard

The issue before the ALJ in this case was whether plaintiff qualified for DIB.  DIB is available to persons unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  DIB claimants must also establish disability while in insured status.  See Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997); see also 20 C.F.R. § 404.130 (setting forth methods of determining insured status based on the claimant's previous earnings).

Disability is determined under a sequential, five-step test.  See, e.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009).  At step one, the ALJ asks whether the claimant engaged in substantial gainful activity ("SGA") since her alleged onset of disability.  Substantial gainful activity is work activity that involves doing significant physical or mental activities, for pay or profit.  20 C.F.R. § 404.1572.  The regulations set forth earnings levels ordinarily indicative of SGA.  See 20 C.F.R. § 404.1574(b)(2).  If the claimant is working at SGA levels, she will be found not disabled.  20 C.F.R. § 404.1520(b).

Second, if the claimant is not working, the ALJ determines whether she suffers from a severe, medically determinable impairment or impairments.  An impairment is "severe" if it significantly limits the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).

Third, if the claimant has a severe impairment, the ALJ determines whether that

impairment meets or equals an impairment listed in SSA regulations as presumptively disabling. These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). In order to meet a Listing, the claimant must present evidence showing that she satisfies each of its "criteria." See Maggard v. Apfel, 167 F.3d 376, 379-80 (7th Cir. 1999). For instance, the mental impairment Listings generally consist of three sets of criteria – the paragraph A criteria (a set of medical findings that substantiate the presence of a particular mental disorder), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). See Windus v. Barnhart, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004). The B criteria have four components: (1) activities of daily living ("ADLs"); (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to work. 20 C.F.R. § 404.1520a(c)(4). Certain Listings may also be met if the claimant has marked limitations in two of these areas. E.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).[1]

---

[1]As alluded to above, plaintiff's substance abuse was an issue in this case. Unlike the other mental impairment Listings, § 12.09, which addresses substance addiction disorders, does not consist of a statement describing the disorder together with a list of necessary medical findings and functional limitations. Instead, it "is structured as a reference listing," which serves to indicate which of certain other listed mental or physical impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances. Id. § 12.00(A). The required level of severity for a substance addiction disorder is met when, as a result of substance abuse, the requirements in one or more of Listings 12.02,

Fourth, if the claimant's impairment does not meet or equal a Listing, the ALJ determines whether she retains the residual functional capacity ("RFC") to perform her past work.  RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule.  SSR 96–8p.

Fifth, if the claimant cannot perform past work, the ALJ determines whether she can perform other jobs existing in significant numbers in the economy.   The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the agency to show that the claimant can make the adjustment to other work.  See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  The ALJ may at step five either rely on the Medical-Vocational Guidelines, commonly known as "the Grid," a chart that classifies a person as disabled or not disabled based on her age, education, work experience and exertional ability, or summon a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite her limitations.  See, e.g., Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994).  However, because the Grid considers only exertional (i.e., strength-related) limitations, if the claimant has significant non-exertional limitations, such as pain or mental limitations, the ALJ may use the Grid only as a "framework" and must consult a VE for a more refined assessment.  See Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005); Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994); Herron, 19 F.3d at 336-37.

---

12.04, 12.06, 12.08, 11.14, 5.05, 5.04, 5.08, 11.02, or 11.03 are satisfied.  Id. § 12.09.  Because Congress has eliminated alcoholism as a basis for obtaining social security benefits, see 42 U.S.C. § 1382c(a)(3)(J), the ultimate inquiry in such a case is whether, "were the applicant not a substance abuser, she would still be disabled."  Kangail v. Barnhart, 454 F.3d 627, 628–29 (7th Cir. 2006) (citing 20 C.F.R. § 416.935).

**B.     Judicial Review**

The issue before the court on § 405(g) review is not whether the plaintiff is disabled <u>vel non</u>.  <u>Cass v. Shalala</u>, 8 F.3d 552, 555 (7th Cir. 1993).  The reviewing court decides only whether the ALJ's decision is supported by "substantial evidence," consistent with applicable law, and sufficiently explained.  <u>See, e.g.</u>, <u>Hopgood ex rel. L.G. v. Astrue</u>, 578 F.3d 696, 698 (7th Cir. 2009).  Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.  <u>Castile v. Astrue</u>, 617 F.3d 923, 926 (7th Cir. 2010).  Thus, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must be upheld.  <u>Elder v. Astrue</u>, 529 F.3d 408, 413 (7th Cir. 2008).  The court must conduct a critical review of the entire record, but it does not re-weigh the evidence, resolve conflicts, or otherwise substitute its judgment for that of the ALJ.  <u>McKinzey v. Astrue</u>, 641 F.3d 884, 889 (7th Cir. 2011).

My review in this case is hindered by plaintiff's failure to develop her arguments.  Her two-page main brief cites no case, statute, or regulation; points to no particular page(s) of the 654-page transcript pertinent to her claims; and fails to comply with the court's briefing letter.  The three-page reply brief does no better and argues issues not mentioned in the initial brief.  As the Seventh Circuit has stated, judges are not like pigs, hunting for truffles buried in the record, <u>Gross v. Town of Cicero, Ill.</u>, 619 F.3d 697, 702 (7th Cir. 2010); <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991), and undeveloped and unsupported arguments or issues first raised in reply may be deemed waived, <u>e.g.</u>, <u>United States v. Thornton</u>, 642 F.3d 599, 606 (7th Cir. 2011); <u>Dexia Credit Local v. Rogan</u>, 629 F.3d 612, 625 (7th Cir. 2010).

## II.  THE RECORD

### A.    Plaintiff's Application and Supporting Materials

On February 19, 2008, plaintiff filed an application for DIB, alleging an onset date of November 1, 1998.  (Tr. at 142.)[2]  In an accompanying disability report, plaintiff indicated that she could not work due to liver cancer, cirrhosis, anxiety, ulcers, and GERD (gastro-esophageal reflux disease), which left her weak and tired, and required medications that caused nausea and vomiting.  (Tr. at 218.)  In a second disability report, plaintiff added back and mental problems, which she said commenced on March 31, 2008, to her list of impairments.  (Tr. at 232.)  In a third report, plaintiff indicated that as of May 19, 2008, her condition had worsened; she needed a walker and felt depressed and ready to give up.  (Tr. at 245.)

The SSA denied the claim initially (Tr. at 72, 92) and on reconsideration (Tr. at 73, 101).  Plaintiff then requested and obtained a hearing before an ALJ.  (Tr. at 110, 117.)

### B.    Hearing Testimony

On December 11, 2008, plaintiff appeared with counsel before ALJ Alan Paez.  The ALJ also summoned a medical expert ("ME") and vocational expert ("VE") to offer testimony.  (Tr. at 31.)  At the outset of the hearing, plaintiff's counsel amended the onset date from November 1, 1998, to October 9, 2004, the date plaintiff last worked at Pick-N-Save.  (Tr. at 32.)

Plaintiff testified that she was 5'6" tall, weighed 142 pounds, with a high school education and some college, lived alone and had one adult child.  (Tr. at 35.)  She last worked in the Pick-N-Save floral department, preparing fresh cut flowers and arrangements, cleaning

---

[2]Plaintiff also applied for supplemental security income ("SSI") (Tr. at 165), but that application failed because plaintiff did not satisfy the means test for SSI (Tr. at 189).  See 42 U.S.C. § 1382.

6

up displays, and doing monthly inventory. She stated that she stopped working due to the emotional fall-out from a horrific divorce. (Tr. at 36.) She also admitted abusing alcohol during this period of time. (Tr. at 36-37.) Plaintiff testified that she did try to work since then. She applied at Wal-Mart but was terminated during her probationary period after customers complained about her psoriasis. (Tr. at 37.) She also tried working at a nursery but found the heavy lifting beyond her abilities. She also worked a seasonal job at the UPS store between Thanksgiving and Christmas in 2006.[3] (Tr. at 38.) She testified that had not tried to work since then, noting her medication side effects, fatigue, and general poor health. (Tr. at 38.)

Plaintiff testified that despite her abstinence from alcohol she continued to have serious problems with her pancreas and liver, including a diagnosis of diabetes in May of 2008. (Tr. at 38-39, 41.) Her doctors indicated that her conditions were terminal, but she took various medications to try to extend her time. (Tr. at 40.) She also testified to back problems, the result of various traumas over the years. She saw a surgeon, Dr. Pond, who recommended surgery, but she needed physical therapy first to try to strengthen her legs and hips.[4] (Tr. at 41.)

Asked about her mental impairments, plaintiff testified that she had been diagnosed with anxiety and depression, for which she received medication and therapy. (Tr. at 42.) She indicated that she had been sexually abused by her aunt as a child, her father was an

---

[3]Prior to the hearing, plaintiff completed a work activity report regarding the nursery job, indicating that she quit because she was not able to maintain the job. (Tr. at 201.) According to SSA records, plaintiff earned between $30,000 and $40,000 in the years 1991 to 1998. She earned nothing from 1999 to 2003. She earned $5171.27 in 2004, $1115.76 in 2005, $933.62 in 2006, $3825.23 in 2007, and nothing in 2008 and 2009. (Tr. at 150, 154, 164, 188.)

[4]According to records later submitted to the AC, plaintiff underwent back surgery in July 2009. (Tr. at 607.)

alcoholic, and she married a man who physically and mentally abused her, leading her to drink. Plaintiff testified that she received therapy for about four months in 1986 after divorcing her first husband. (Tr. at 42, 51-52, 57.) She re-married in June 1995, and her second husband abused alcohol and drugs. (Tr. at 52.) He filed for divorce in 2002[5] and because she received no maintenance until October 2004, she returned to work at Pick-N-Save in early 2004. (Tr. at 53-54.) She also testified that she attended college part-time studying social work during this period. (Tr. at 54.) Plaintiff testified that the divorce was difficult, protracted, and expensive. (Tr. at 55.) However, she did not receive therapy at that time, i.e., around 2005. (Tr. at 57.)

Plaintiff testified that in a typical day she did as much as she could, receiving help from "Comfort Keepers" with the tasks she could not manage, such as vacuuming and changing sheets. (Tr. at 43.) They also assisted if she needed help in the shower or getting dressed. (Tr. at 48.) She was able to care for her personal needs and her pets. She tried to take a walk to the pool area where she lived to sit and read. She had a driver's license and could drive about twenty minutes (Tr. at 43-44), but getting in and out of the car was hard because of her low back, hips, and knees (Tr. at 44-45). She found sitting for an extended time difficult, even at home; after about twenty minutes she had to get up and walk for about five minutes. She also complained of significant fatigue with even simple chores or washing her hair. She avoided carrying more than five pounds. (Tr. at 45.) She had no income and lived off of her savings. (Tr. at 46-47.) Plaintiff reported sobriety since April 2008, attending AA meetings once a week. (Tr. at 50.)

---

[5]The record indicates that plaintiff's second husband filed for divorce in December 2002. (Tr. at 435, 440, 441.)

The ME, Paul Weisse, Ph.D., testified that the record supported diagnoses of depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and alcohol dependence. (Tr. at 58-59.) In considering the B criteria of the applicable Listings, he found mild to moderate limitation of ADLs; moderate limitation at most in social functioning; moderate limitation in concentration, persistence, and pace; and no evidence of decompensation with regard to Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders); the record contained evidence of more than one event related to Listing 12.09 (substance addiction disorders), but those were solely related to alcohol withdrawal and detoxification. (Tr. at 59-60.) Therefore, her mental impairments did not meet a Listing. Regarding further limitations, Dr. Weisse found that plaintiff would have a moderate degree of difficulty staying on task. (Tr. at 60.) These limitations assumed sobriety; with alcohol, the limitations would be more significant. (Tr. at 61.) Plaintiff's lawyer asked about a diagnosis of PTSD related to plaintiff's childhood abuse, but Dr. Weisse found no documentation of the symptoms indicative of that condition. (Tr. at 63.) Counsel did not ask Dr. Weisse to provide a retrospective diagnosis regarding plaintiff's condition prior to March 31, 2005.

The VE, Spencer Mosley, identified plaintiff's past work as a floral worker as light, SVP 3; and cashier as light or sedentary, SVP 2.[6] (Tr. at 67-68.) The ALJ then asked a hypothetical question assuming a person of plaintiff's age, education, and work experience, able to do light work with a sit/stand option; occasional stooping, crouching, kneeling, and crawling; limited to

---

[6]"SVP," the acronym for "Specific Vocational Preparation," refers to the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. SVP 2 means "anything beyond a short demonstration up to and including 1 month," i.e., unskilled work; SVP 3 means "over 1 month up to and including 3 months," i.e., semi-skilled work. See Bray v. Commissioner of Social Security Admin., 554 F.3d 1219, 1230 (9th Cir. 2009).

jobs that could be performed while using a handheld assistive device; work limited to one or two-step tasks; and only occasional decision-making and changes in work setting. The VE testified that such a person could work as a callout operator, telephone quote clerk, and order clerk. (Tr. at 68-69.) If the person could not, due to a combination of medical conditions and symptoms, perform a full day's work, all the jobs would be eliminated. Employers would tolerate one un-excused absence per month and permit a morning and afternoon break; exceeding these limits would preclude the jobs identified. (Tr. at 69.) Plaintiff's lawyer asked the VE no questions. (Tr. at 70.)

## C.  Medical Evidence Before the ALJ

### 1.  Treating Providers

The medical records in the transcript, which date back to 1998, indicate that plaintiff was hospitalized multiple times related to chronic pancreatitis and cirrhosis secondary to alcohol abuse: in November 1998 (Tr. at 459); December 1998 (Tr. at 329-31); March 1999 (Tr. at 281-317, 406-09, 459);[7] July 1999 (Tr. at 394-405, 455); August 1999 (Tr. at 318-28, 455-56); October 1999 (Tr. at 387-93); and November 1999 (Tr. at 380-86). Doctors generally treated her with hydration and pain control (e.g., Tr. at 382), resulting in stabilization and discharge in good condition (e.g., Tr. at 289). On November 11, 1999, Dr. Suzanne Grimm performed a psychiatric evaluation, with plaintiff admitting that she was an alcoholic but denying a history of depression or anxiety. (Tr. at 383.) Dr. Grimm assessed probable dysthymia[8] and alcohol

---

[7]A March 8, 1999 note indicates that plaintiff had a longstanding history of pancreatitis with several hospitalizations since 1994. (Tr. at 287.)

[8]Dysthymia is a mood disorder manifested by depression. Stedman's Medical Dictionary 556 (27th ed. 2000).

dependence, recent relapse. (Tr. at 384.) She recommended that plaintiff switch from Zoloft to Remeron, which would increase plaintiff's appetite and assist with sleep. Dr. Grimm also recommended that plaintiff follow-up with her therapist in the community; plaintiff was unwilling to undergo further intervention and felt that her alcohol dependence was back under good control. (Tr. at 384.)

In October of 2000, plaintiff underwent a hysterectomy (Tr. at 363), after previous measures to treat bleeding failed (Tr. at 467). Plaintiff denied alcohol use since 1998, but during her October 12, 2000 office visit with Dr. Lee Duncklee, her primary physician, she was noted to smell of alcohol. (Tr. at 363, 453.) On November 2, 2000, plaintiff saw Dr. Mark Knabel regarding an enlarging nodular growth along her left lateral neck. Dr. Knabel excised the lesion under local anesthetic (Tr. at 464) and removed the sutures on November 13, 2000, finding that the wound had healed nicely (Tr. at 465). On November 10, 2000, plaintiff saw Dr. Duncklee for a hysterectomy follow-up, and he noted her history of chronic cirrhosis and pancreatitis due to alcohol abuse. (Tr. at 451.)

Plaintiff returned to Dr. Duncklee on January 26, 2001, regarding her chronic cirrhosis and history of pancreatitis. Other than a mild head cold, she complained of no symptoms at that time. Dr. Duncklee was to see her again in four months to re-evaluate, and plaintiff was to use Tylenol as needed. (Tr. at 452.) On May 25, 2001, plaintiff saw Dr. Duncklee complaining of psoriasis of the scalp and a possible pancreatic flare. (Tr. at 449, 452.) Dr. Duncklee ordered an abdominal CT scan, which showed minimal to no change in her chronic pancreatitis. (Tr. at 450, 478.) Her liver showed some fatty infiltrate, which possibly accounted for elevated LFT's (liver function tests). Her blood sugar was borderline high, but plaintiff had not been fasting when tested. Dr. Duncklee ordered no change in therapy at that time. (Tr.

at 450.)

On June 29, 2001, plaintiff returned to Dr. Duncklee regarding psoriasis, pancreatitis, and cirrhosis. She complained of mild nausea, vomiting, diarrhea, and requested a stronger medication. She indicated that Locoid minimally helped with her psoriasis, but her GERD was much improved with Nexium. Dr. Duncklee prescribed Zofran for pancreatitis. (Tr. at 450.)

On August 2, 2001, plaintiff saw Dr. Duncklee with a four week history of numbness in the lateral aspect of the left leg. X-rays revealed no underlying bony abnormalities, and Dr. Duncklee assessed peroneal nerve palsy of uncertain etiology, prescribing Orudis. (Tr. at 447, 477.) If the condition did not resolve, he would make a neurology referral. (Tr. at 448.) Plaintiff denied any alcohol use in the past three years, but Dr. Duncklee felt she smelled of alcohol. (Tr. at 447.)

On August 23, 2001, plaintiff was hospitalized due to vomiting with dehydration and ketosis. Doctors provided IV pain medications, hydration, and close monitoring, with plaintiff slowly improving over forty-eight hours and discharged home in fair condition on August 25. She went through no alcohol withdrawal symptoms during her hospital stay and claimed abstinence from alcohol for the past three years. (Tr. at 368, 448.) Testing suggested probable alcohol intake, however, and her husband thought she was surreptitiously imbibing. (Tr. at 370.) On August 31, 2001, Dr. Mark Bettag reported the results of plaintiff's CBC test, noting her platelet count had returned back to normal, which he saw no need to further monitor. (Tr. at 445.) He felt her thrombocytopenia[9] related to alcoholism. (Tr. at 446.)

Plaintiff was again hospitalized on October 5, 2001, due to severe vomiting and

---

[9]Thrombocytopenia is a condition in which there is an abnormally small number of platelets in the circulating blood. Stedman's Medical Dictionary 1831 (27th ed. 2000).

dehydration. (Tr. at 351, 446.) Dr. Duncklee assessed dehydration, chronic alcoholism, and alcoholic hepatitis. (Tr. at 354.) Doctors provided IV fluids and performed an upper endoscopy, which showed severe erosive esophagitis. (Tr. at 351, 357.) An abdominal CT revealed a severely abnormal liver with enlargement and fatty infiltration; inflammatory changes in and around the head of the pancreas, which could represent pancreatitis; and a small amount of free pelvic fluid. (Tr. at 361.) An AODA (alcohol and other drug abuse) evaluation recommended in-patient therapy, but plaintiff refused. (Tr. at 351.) Plaintiff denied any alcohol intake, but her history was noted to have been unreliable in the past. Her medical history was listed as alcoholic cirrhosis, non-compliant with alcohol abstinence; and poor history of chronic pancreatitis status post pseudo-cyst intervention several years ago. (Tr. at 353.) She was discharged on October 9, 2001, with diagnoses of alcoholism, alcoholic pancreatitis, alcoholic cirrhosis, and related conditions secondary to alcoholism, and advised to follow up with Dr. Shahla Durrani, a gastroenteroligist, in two weeks. (Tr. at 351, 355, 437.)

Plaintiff saw Dr. Durrani on October 23, 2001, reporting that she felt 100% improved. Dr. Durrani diagnosed cirrhosis of the liver with alcohol intoxication, and although plaintiff reported abstaining and feeling well, the doctor started her on Aldactone for the anti-androgenic properties.[10] Dr. Durrani also diagnosed severe erosive esophagitis, for which plaintiff was to

_____

[10]Aldactone is used to treat certain patients with hyperaldosteronism (the body produces too much aldosterone, a naturally occurring hormone); low potassium levels; and in patients with edema (fluid retention) caused by various conditions, including heart, liver, or kidney disease. It causes the kidneys to eliminate unneeded water and sodium from the body into the urine, but reduces the loss of potassium from the body. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000733/.

13

continue on Protonix.[11]  (Tr. at 438.)

On November 2, 2001, plaintiff saw Dr. Duncklee regarding her weight after the recent hospitalization.  Plaintiff claimed she was not drinking but refused to attend AA.  She was willing to see her counselor to support her sobriety.  Dr. Duncklee counseled her on the importance of being alcohol free and highly recommended AA or similar support.  (Tr. at 442.)

On November 5, 2001, plaintiff saw Dr. Stephen Kunkel on referral from Dr. Duncklee regarding symptoms of neuritis involving the lateral aspect of the left leg and left forearm.  (Tr. at 440.)  She reported no knee or back pain, nor did she claim a history of back or neck pain.  (Tr. at 443.)  Dr. Kunkel scheduled electro-diagnostic studies.  (Tr. at 440.)  The studies suggested peroneal mononeuritis most likely related to her known history of alcoholism, and ulnar mononeuritis again possibly secondary to a known history of alcoholism.  (Tr. at 475.)  Dr. Kunkel prescribed Neurontin to treat the symptoms.  He hoped for improvement over time as long as she abstained from alcohol.  (Tr. at 476.)

On December 15, 2002, plaintiff visited the emergency room complaining of anxiety the past several weeks after her husband served her with divorce papers.  Dr. Duncklee had seen her in his office and provided Ativan, on which she did well until the previous day when she had multiple hallucinations.  Dr. John Hron diagnosed situational anxiety and provided Ambien and told her to double her dose of Lorazepam.[12]  (Tr. at 350.)

On December 17, 2002, plaintiff saw Dr. James Laurino with acute anxiety secondary

---

[11]Protonix is used to treat gastroesophageal reflux disease (GERD). http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000177/.

[12]Ativan is the brand name of Lorazepam, an anti-anxiety medication. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/.

14

to the sudden filing of divorce by her husband. She reported insomnia for seven days and visiting the ER because she began to have hallucinations of things crawling around. She was given a prescription for Lorazepam during the day and Ambien to help with sleep. Dr. Laurino noted a medical history significant for alcoholism resulting in acute and chronic pancreatitis. She reported abstinence for several months and sporadically took Spironolactone since her pancreatitis episodes. She also complained of an eczema flare-up. Dr. Laurino assessed anxiety disorder and eczema/psoriasis. He continued her on Lorazepam and Ambien for anxiety, and ointment for her psoriasis. She was also advised to start on Inderal-LA to control tachycardia as well as reduce blood pressure. (Tr. at 441.)

On January 16, 2003, plaintiff saw Dr. Laurino for follow-up of her medications for alcoholism, pancreatitis, tachycardia, and psoriasis. Dr. Laurino noted that during their last visit plaintiff had acute anxiety on learning of her husband filing for divorce. She noted some tachycardia during a divorce hearing that week but not at any other time. She reported taking Tylenol for some epigastric pain and headaches. The psoriasis on her hands had gotten better with the ointment and as long as she took Lorazepam she had no urge to drink. (Tr. at 435.) Dr. Laurino continued Betamethadon ointment for her hands, Propranolol for tachycardia, Lorazepam for anxiety and alcoholism, and Ambien for insomnia. (Tr. at 435-36.)

On April 25, 2003, plaintiff saw Dr. Patricia Cackowski complaining of anxiety, racing heart, and trouble sleeping. (Tr. at 429.) Dr. Cackowski ordered various tests, including liver enzymes, and if that looked okay they would consider something like Trazodone for sleep and an SSRI anti-depressant for anxiety. (Tr. at 430.) Plaintiff's enzymes were much worse than in 2001, requiring further testing. (Tr. at 432.)

On May 5, 2003, plaintiff underwent an abdominal CT scan, with the liver appearing

stable since the previous scan on June 1, 2001, and no new hepatic lesions. (Tr. at 349, 472.) The scan further revealed no evidence of definite pancreatic mass disease. (Tr. at 349.)

On May 11, 2003, plaintiff saw Dr. F. Andrew Bock regarding a facial rash. Dr. Bock provided an injection of Rocephin, discussed the case with Dr. Brian DeMaster, and discharged plaintiff in good condition. (Tr. at 346.) She was to follow up with Dr. DeMaster and take Tylenol as needed for pain. (Tr. at 347.) The note lists a past medical history of untreated hypertension and history of recurrent tachycardia, but makes no mention of the other impairments at issue in this case. (Tr. at 346.)

Plaintiff saw Dr. DeMaster on May 12, 2003, for follow-up regarding her right-sided facial cellulitis, which gradually developed over several days. (Tr. at 432.) The swelling had improved slightly with the Rochephin injection. (Tr. at 432-33.) She no longer had the pain, or fever, and reported no new concerns or problems. Dr. DeMaster assessed improving cellulitis, provided Rocephin and a prescription for Keflex. (Tr. at 433.) No other problems were noted.

The records then skip to January 22, 2004, when plaintiff saw Dr. John Howell complaining of congestion and coughing. Dr. Howell noted a history of anxiety and alcoholism. He assessed bronchitis, chronic anxiety, and nicotine addiction, and provided Cephalexin, an antibiotic,[13] and Robitussin for her cough. She was given a note to be off work until January 26, 2004, and counseled to use a humidifier and quit smoking until she got over this infection. She was also counseled to avoid alcohol. (Tr. at 427, 434.)

On January 26, 2004, plaintiff's son brought her to the hospital, and she was admitted

---

[13]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000762/.

16

voluntarily due to "confusion of thought and actions." (Tr. at 336.) The admission note indicates that initial concern by her primary physician, Dr. DeMaster, was that she might be having some sort of drug reaction, and she was admitted for further evaluation of these hallucinations. The note lists as medical problems chronic alcoholism, alcoholic cirrhosis, hepatitis, chronic pancreatitis, psoriasis, and chronic bronchitis. (Tr. at 336.) Dr. Jeffrey Lynds diagnosed probable alcoholic hallucinations secondary to alcohol withdrawal. (Tr. at 337.) He found her medically stable, and indicated that Dr. DeMaster would assume care in the morning. (Tr. at 338.) Dr. Grimm, the psychiatrist who also saw plaintiff in 1999, evaluated her again, finding her responses "so inconsistent, so irrelevant that thought not to be accurate." (Tr. at 339.) She was reportedly on Effexor, an anti-depressant.[14] On mental status exam, Dr. Grimm found plaintiff on the floor searching for "things that fell out" and "attending to unseen others." (Tr. at 339-40.) Dr. Grimm diagnosed psychotic disorder, NOS; alcohol dependence, and rule out alcohol hallucinosis and poly-substance abuse/dependence, and question history of depression and/or anxiety, with a GAF of 20-25 on admission.[15] (Tr. at 340.) Plaintiff advised a therapist, Kathy Thiel, MSSW, that she had been in recovery for alcoholism but relapsed about 3 ½ weeks ago related to stress from a pending divorce. (Tr. at 342.) Plaintiff related

---

[14]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000947/.

[15]"GAF" – the acronym for "Global Assessment of Functioning" – rates a person's psychological, social, and occupational functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51–60 "moderate" symptoms, 41–50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32–34 (4th ed. 2000).

in-patient detox treatment fifteen years previously and out-patient treatment in 2003. Plaintiff could not recall whether she had been taking any anti-depressants but did report a history of visual hallucinations in December 2003 from cause unknown. (Tr. at 342.) Plaintiff was at the time working in the floral department at Pick-N-Save and hoped to return to work upon discharge. (Tr. at 343.) She reported leisure activities of going to the library, reading, spending time with friends, listening to music, and attending church and catechism. (Tr. at 344.) She was to receive an AODA assessment with a recommendation for follow-up counseling on discharge, in addition to resuming AA meetings. (Tr. at 344-45.) The January 28, 2004, discharge note from Dr. Grimm lists diagnoses of alcohol dependence and withdrawal hallucinations, and psychotic disorder, NOS, secondary to substance use, with a GAF of 45-50. She was to follow up regarding AODA treatment. (Tr. at 335.)

The next treatment note, from June 27, 2005, indicates that plaintiff saw Dr. DeMaster as a new patient regarding abdominal pain.[16] Dr. DeMaster found her symptoms consistent with ulcer disease. He ordered various tests, referred her for an edoscopy and provided samples of Nexium, which is used to treat gastroesophageal reflux disease (GERD).[17] She reported using Lorazepam as needed for anxiety. (Tr. at 425.) The record contains no further treatment notes from 2005, and no notes at all from 2006 and 2007.

On June 4, 2008, Dr. DeMaster completed an RFC questionnaire in connection with plaintiff's DIB application, listing plaintiff's diagnoses as liver cirrhosis, depression/anxiety, alcohol abuse (in remission), diabetes mellitus, sciatica, and asthma. He checked boxes

---

[16]Although this note indicates that plaintiff was a new patient to Dr. DeMaster, earlier notes indicate that he saw her in May 2003. (Tr. at 432.)

[17]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001062/.

identifying a number of symptoms (Tr. at 561), which he indicated would occasionally interfere with the attention and concentration needed to perform even simple work tasks (Tr. at 562). He indicated that she could walk less than one block, sit and stand for fifteen minutes continuously, sit and stand/walk less than two hours in an eight hour workday, and could not perform even low stress jobs. (Tr. at 562.) She required a job that permitted shifting positions at will and needed three to four unscheduled breaks, lasting fifteen to twenty minutes, during an eight-hour workday. She required a walker when standing and walking. She could rarely lift less than ten pounds, never more. She could rarely twist, stoop, or climb stairs, and never crouch or climb ladders. (Tr. at 563.) She was also to avoid all exposure to extreme heat, high humidity, solvents, fumes, and chemicals. (Tr. at 564.) Asked the earliest date to which these limitations applied, Dr. DeMaster initially wrote 4/08, but then crossed that out and filled in 11/1998. (Tr. at 564.) In a June 19, 2008 letter, Dr. DeMaster explained:

> This letter is regarding the above named patient who was seen recently in our office for disability evaluation. There is some question regarding when her symptoms initiated. She had some acute problems earlier this year; however, she did call back stating that her initial episode for pancreatitis and associated surgery was November of 1998. We will modify her form indicating this as far as the initial onset of some of her symptoms and concerns related to her chronic medical issues. Please take this into consideration as modified.

(Tr. at 565.)

On November 5, 2008, plaintiff saw Dr. Roland Moreno for low back pain. She reported a history of multiple falls, with a past medical history of scoliosis not requiring surgical treatment or bracing. Dr. Moreno reviewed an MRI completed in March 2008, which revealed disc bulges and degenerative disc disease. She had undergone epidural injections, which helped temporarily with her symptoms. However, the pain persisted with flexion, prolonged sitting, and twisting. She was taking Tylenol for pain. She also complained of shoulder pain for about ten

19

years. She had undergone an injection for this as well, which did not ameliorate her symptoms. She further complained of hip pain of one year duration, aggravated by walking and getting in and out of a car. Finally, she complained that she recently developed pain in both knees. (Tr. at 586.) An x-ray of the lumbosacral spine revealed spondylosthesis of L5 on S1. Dr. Moreno found plaintiff's symptoms worrisome for myelopathy and scheduled an EMG. She was also to limit twisting, bending, and heavy lifting, and take Mobic. Dr. Moreno found the shoulder pain suggestive of rotator cuff tendinopathy, which would be evaluated by x-rays, and recommended exercises to improve range of motion. He found the knee pain suggestive of osteoarthritis and ordered x-rays. He also adjusted her walker to make her posture more erect, and plaintiff appreciated a good degree of improvement with just this minor change. She was also to apply ice to the area and limit extended walking. (Tr. at 588.)[18]

In an undated mental RFC questionnaire faxed to the SSA on December 8, 2008, plaintiff's counselor, David Aardappel, MSW, LCSW, discussed plaintiff's history and recently improved psychological state, but indicated that she is not able to work because of health issues. (Tr. at 259, 567.)[19] He indicated that he had been meeting with her on a bi-weekly basis since September 22, 2008, and diagnosed adjustment disorder with mixed anxiety and depression and alcohol dependence/abuse in remission, with a current GAF of 58-60. He indicated that her health was the cause of her stress, anxiety and depression, and that she was

---

[18]On November 28, 2008, defendant developed an individualized plan for employment with the state Division of Vocational Rehabilitation ("DVR") with the goal of returning to part-time work. (Tr. at 600.)

[19]Mr. Aardappel offered no opinion as to when plaintiff became disabled, and there is no indication in the record that he counseled her during the relevant time or that he is qualified to opine on her physical condition.

20

unable to work because of her physical conditions. Her prognosis (mentally) seemed positive. (Tr. at 568.) Aardappel checked as symptoms decreased energy, feelings of guilt, generalized persistent anxiety, recurrent and intrusive recollections of traumatic experiences, and sleep disturbance. (Tr. at 569.) He rated her mental abilities for work as unlimited or very good, writing: "again, it isn't her mental condition that precludes work." (Tr. at 570.) He attached to the report a mental status evaluation completed by Peter Kores, Ed.D., on June 11, 2008. (Tr. at 571.) Dr. Kores diagnosed alcohol dependency, in brief remission; mood disorder due to medical conditions, with major depressive-like episode; and generalized anxiety disorder, with a present GAF of 55 (highest in the past year, 62). (Tr. at 573.) Dr. Kores concluded: "It certainly appears that Lisa's ongoing health conditions of a deteriorating nature preclude any competitive employment at this time. She certainly does appear to be intellectual and academically competent." (Tr. at 574.)

On December 31, 2008, Dr. Jonathan Pond prepared a statement of capacities form, finding that plaintiff could lift up to twenty pounds occasionally, ten pounds frequently; stand at least two hours in an eight hour day; and sit at least six hours in an eight hour day. She needed to use a walker, required a sit/stand option, with no bending/stooping. (Tr. at 606.) The form does not indicate when these restrictions commenced.

## 2.    SSA Consultants

The SSA, through the state agency, arranged for plaintiff's application to be evaluated by several consultants. On April 29, 2008, Michael Mandli, Ph.D., completed a psychiatric review technique form, finding insufficient evidence to assess the severity of plaintiff's mental impairments prior to the date last insured ("DLI"). (Tr. at 517-30.) On June 11, 2008, Dr. Syd Foster completed an assessment of plaintiff's physical RFC prior to the DLI, finding plaintiff

capable of light work, with occasional balancing and no concentrated exposure to hazards. (Tr. at 535-52.)

On June 12, 2008, Eric Edelman, Ph.D., completed a psychiatric review technique form, evaluating plaintiff (as of the DLI) under Listing 12.03 (Psychotic Disorders), 12.06 (Anxiety Disorders), and 12.09 (Substance Addiction Disorders). (Tr. at 543.) Under 12.03, he noted her psychotic disorder, NOS, when in alcohol withdrawal (Tr. at 545), and under 12.06 situational anxiety (Tr. at 548). Under 12.09, he checked the cross-references to 12.06, 11.14 (peripheral neuropathies), 5.05 (liver damage), 5.04 (gastritis), and 5.08 (pancreatitis). (Tr. at 551.) Under the B criteria, he found mild limitation of ADL's; mild limitation of social functioning; moderate limitation of concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 553.) The evidence did not establish the presence of C criteria. (Tr. at 554.) In an accompanying mental RFC assessment, Dr. Edelman found moderate limitations in seven categories, no significant limitation in twelve, and left blank one. (Tr. at 557-59.)

## D.    The ALJ's First Decision

In a decision dated January 26, 2009, the ALJ denied plaintiff's claim. He first noted that in light of her earnings record plaintiff had to establish disability on or before March 31, 2005 in order to obtain DIB. (Tr. at 78, 163.) The ALJ further noted that DIB cannot be paid if drug or alcohol dependence is a material factor contributing to the determination of disability. The key factor in such a situation is whether the individual would still be disabled if alcohol or drug use were stopped. (Tr. at 78.)

The ALJ then proceeded through the five-step procedure, finding that plaintiff did not engage in SGA between October 9, 2004, and March 31, 2005. He then found that, through

the DLI, plaintiff had the severe impairments of cirrhosis of the liver secondary to alcoholism, pancreatitis secondary to alcoholism, diabetes mellitus, herniated disc, and depression, none of which met or equaled a Listing through the DLI. The ALJ reviewed the medical evidence, noting that plaintiff had been hospitalized on at least eight occasions between November 1998 and January 2004 for chronic alcohol-induced pancreatitis. (Tr. at 80.) However, when plaintiff ceased her alcohol abuse, the pancreatitis and pain symptoms resolved, and she was able to function. She sought no treatment during the relevant time period and worked a number of part-time jobs after her onset date. (Tr. at 80-81.) The ALJ further noted that the record included little in the way of longitudinal treatment for any mental health impairments, aside from the reference in an April 25, 2003 office note that plaintiff used Lorazepam for anxiety and some evidence of situational anxiety during plaintiff's divorce. Plaintiff testified that she was not under the care of a psychiatrist or psychologist around the relevant time, nor did medical records reveal significant limitations in plaintiff's mental ability to do basic work activities during the relevant time. The ALJ agreed with the ME that, absent any alcohol abuse, plaintiff's depressive and anxiety disorders imposed no more than moderate limitations under the B criteria. The ALJ further noted that there was no strong indication that, prior to March 31, 2005, plaintiff may have suffered from persistent mental deficits that went beyond her problems with alcohol. (Tr. at 81.)

The ALJ noted the medical evidence of physical problems, including asthma and psoriasis, existing prior to the DLI, but the evidence failed to establish that these problems were severe. Plaintiff developed diabetes mellitus and orthopedic problems involving her back and knees in 2008, long after the DLI. (Tr. at 82.) Further, any diagnosis of cancer or end stage liver disease likewise came several years after the DLI. (Tr. at 82.) The later medical

23

evidence, including the report from Dr. Pond, spoke to plaintiff's current level of impairment, but it failed to provide any opinion on the level of her impairment prior to March 31, 2005. (Tr. at 82-83.)

The ALJ then determined that, through the DLI, plaintiff retained the RFC to perform light work, to account for some pain, fatigue, and decreased activity due to cirrhosis and ascites, with a sit/stand option, use of a hand-held device to account for her back problems, and work that is low stress and requires only one or two-step tasks. (Tr. at 83.) He noted that this determination did not conflict with the state agency medical consultants who previously evaluated the claim. The record contained no doctor ordered limitations on plaintiff's ability to work prior to March 31, 2005. (Tr. at 83.) Based on this RFC, the ALJ found that plaintiff could not perform her past work but could perform other jobs. The ALJ noted that, had plaintiff been able to perform the full range of light work, Grid rules 202.21 and 202.20 would direct a finding of not disabled. However, because of plaintiff's additional limitations, the ALJ relied on the VE's testimony that plaintiff could work as a callout operator, telephone quote clerk, and order clerk. He therefore found her not disabled. (Tr. at 84.)

## E. AC Remand Order

Plaintiff sought review by the AC (Tr. at 136), and on April 3, 2009, the Council sent the case back to the ALJ (Tr. at 86). The AC remanded the case for resolution of two issues. First, the ALJ's decision did not include an evaluation of Dr. DeMaster's June 2008 treating source opinion, in which he found that plaintiff's impairments precluded all work and suggested that her symptoms and limitations dated back to November 1998. Second, the ALJ's decision stated that, without substance abuse, plaintiff's mental impairments would result in moderate limitations. However, the AC noted that when evaluating substance abuse as a contributing

24

factor there must first be a finding of "disabled" with all impairments, including substance abuse, before evaluating the impairments apart from substance abuse. (Tr. at 88.) The AC directed that, on remand, the ALJ give consideration to the treating source opinion and explain the weight given to the opinion. (Tr. at 88.) If necessary, the ALJ was to obtain evidence from a ME to clarify the severity of plaintiff's impairments and any resulting limitations with and without substance abuse. If warranted by the expanded record, the ALJ was to obtain supplemental evidence from a VE. Finally, if plaintiff was found disabled, the ALJ was to conduct the further proceedings required to determine whether alcoholism was a contributing factor material to the determination of disability. In compliance with these directives, the ALJ was to offer an opportunity for a hearing, address the evidence submitted with the request for review, take any further action needed to complete the record, and issue a new decision. (Tr. at 89.)

## F.    The ALJ's Decision on Remand

On June 30, 2009, the ALJ again issued an unfavorable decision. (Tr. at 21-27). The ALJ incorporated by reference much of his previous decision and found no basis for conducting a second hearing. (Tr. at 24.) The ALJ reiterated that plaintiff had to establish disability between October 9, 2004 and March 31, 2005. (Tr. at 24-25.)

Regarding Dr. DeMaster's report, the ALJ noted that the record contained no medical evidence during the relevant period and thus no documentary basis for a finding of disability. Plaintiff received treatment for bronchitis, anxiety, and alcohol abuse in January 2004, including a hospitalization from January 26 to January 28, at which point she was discharged with instructions to follow up with medication treatment, detoxification, and group programming. However, she obtained no further treatment until June 27, 2005, at which time she saw Dr.

DeMaster. (Tr. at 25.) The ALJ found that Dr. DeMaster's statement that plaintiff's symptoms dated back to November 1998 was not based on first-hand, objective treatment records and was not determinative as to the relevant period at issue. (Tr. at 25-26.) The ALJ noted that in the June 19, 2008 addendum to his report, Dr. DeMaster admitted that he changed the date on the form (regarding when plaintiff's symptoms commenced) from April 2008 to November 1998 based solely on plaintiff's self-report and not on any review of objective medical evidence. (Tr. at 26.)

With regard to the second issue on remand, the ALJ reviewed the ME's testimony, which demonstrated that the ME considered plaintiff's alcohol dependency when he opined that she did not meet Listings 12.04, 12.06, and 12.09. The ALJ indicated that any resulting confusion in acknowledging that plaintiff still did not meet these Listings at the time of the hearing, when she was sober, did not change the ultimate conclusion. (Tr. at 26.)

The ALJ noted plaintiff's submissions to the Appeals Council, in which her counsel indicated that she was deserving of benefits, and that her condition had recently deteriorated. However, plaintiff did not submit additional evidence, specifically from the relevant period. The ALJ stated that while he was sympathetic to plaintiff's situation, he could not dispense with the law and award benefits without an evidentiary basis. Therefore, the ALJ concluded that plaintiff had not established, with the required objective medical evidence, that she suffered from a severe impairment during the relevant time period. (Tr. at 26.) Consequently, he again found her not disabled and denied the application. (Tr. at 27.)

## G.    Second Request for AC Review

Plaintiff requested that the AC review the ALJ's June 30, 2009 decision or otherwise reopen the matter (Tr. at 4, 138, 265, 614-15), and submitted additional evidence in support

of her claim,[20] including records relating to her July 7, 2009, back surgery with Dr. Pond (Tr. at 607-09, 623-28).  On August 10, 2009, Dr. Pond completed a new statement of capacities form, which further downgraded plaintiff's abilities.  (Tr. at 610, 619.)  Plaintiff also submitted an August 12, 2009, letter from Dr. DeMaster, which indicated:

> This letter is in regard to the above-named patient, who I have been seeing routinely here in our office since 2003 for her chronic medical issues.  She recently underwent lumbar back surgery for progressively worsening pain and sciatic type symptoms.  The patient requested that a letter be written to verify that she has had a history of chronic back problems going back to her teenage years.  She states that she had a series of accidents that started issues related to her back, and things had been intermittent but then gradually worsened over the last several months.  I started seeing her as noted in 2003.  I do not have old records available for verification of the above; however, it is requested that this be reported per the patient.

(Tr. at 612, 618, 629.)  Plaintiff also submitted a November 12, 2009, letter from Aardappel indicating that the "cumulative effects of childhood trauma, abusive situations as an adult and her long-term alcoholism have left her incapable of work" (Tr. at 648), and a March 18, 2010, letter from her life insurance company waiving deductions based on verification of disability (Tr. at 646).

This time, the AC denied plaintiff's requests.  (Tr. at 6, 12, 16, 140.)  The instant action followed.

---

[20]Because the AC denied plaintiff's request to review the ALJ's June 30, 2009 decision, this evidence, although technically a part of the administrative record, cannot be considered in determining the correctness of the ALJ's decision.  Diaz v. Chater, 55 F.3d 300, 305 n.1 (7th Cir. 1995).  Plaintiff makes no argument that the Council's refusal to review the ALJ's decision was based on a mistake of law, and the AC's refusal to re-open the case is not subject to judicial review.  Id.

### III.  DISCUSSION

**A.     Plaintiff's Main Brief**

**1.     Dr. DeMaster's Report**

Plaintiff first argues that the ALJ improperly substituted his judgment for Dr. DeMaster's. The ALJ rejected Dr. DeMaster's report because it was based on plaintiff's self-reported symptoms rather than objective data, but plaintiff contends that doctors rely on self-reported symptoms all the time.  (Pl.'s Br. [R. 16] at 1.)

The ALJ stood on solid ground in discounting Dr. DeMaster's report based on the lack of objective support in the record.  See, e.g., Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) (stating that "if the treating physician's opinion is . . . based solely on the patient's subjective complaints, the ALJ may discount it"); White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) (affirming the ALJ's rejection of a doctor's opinion based on "subjective complaints" rather than "accepted medical techniques"); Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.").  Plaintiff cites no authority and develops no argument in support of her claim of error in this regard.

Further, to the extent that a physician may properly rely on a patient's statements in evaluating her condition, it is important to note that in this instance Dr. DeMaster did not – in either the June 2008 or August 2009 letters – affirmatively endorse plaintiff's statements that she experienced disabling symptoms dating back to 1998.  Rather, he appeared to acquiesce in her wish that the form reflect her statement as to when her problems started.  Nor did Dr. DeMaster opine that the severe limitations he imposed dated back to November 1998 (or any

other date prior to the DLI).  Rather, he agreed to "modify her form indicating this as far as the initial onset of some of her symptoms and concerns related to her chronic medical issues." (Tr. at 565.)  Thus, to the extent that social security law recognizes the ability of a physician to make a "retrospective diagnosis," Dr. DeMaster made no such diagnosis here.[21]

## 2.    Mental Impairment

Plaintiff next argues that the ALJ erred in finding that her mental impairment was never at Listing level.  Plaintiff disagrees with that finding, pointing to her "tragic history of physical and mental abuse, dating back to childhood and two failed marriages."  (Pl.'s Br. at 1.) However, in order to meet a Listing, the claimant bears the burden of producing evidence demonstrating that she satisfies all of the criteria of a specific section.  See, e.g., Maggard, 167 F.3d at 380.  Plaintiff cites no evidence and develops no argument that she meets any Listing; merely pointing to a series of unfortunate life events will not suffice.  Nor does plaintiff provide any basis for concluding that the ALJ erred in relying on the ME and state agency consultants on this issue.  See White, 415 F.3d at 659 (upholding ALJ's reliance on ME and state agency consultants).  Indeed, as the Commissioner notes, the record before the ALJ contains no medical opinion from anyone finding plaintiff disabled due to a mental impairment.  Counselor Aardappel wrote that "it isn't her mental condition that precludes work" (Tr. at 570); Dr. Kores

_____

[21]Because plaintiff develops no argument regarding a retrospective diagnosis, further discussion is unnecessary.  However, for the sake of completeness I note that in order for such an opinion to be persuasive, the record must contain corroborating evidence contemporaneous with the eligible period.  See, e.g., Allord v. Barnhart, 455 F.3d 818, 822 (7th Cir. 2006); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998).  This corroboration need not come in the form of medical evidence; lay testimony can suffice.  See, e.g., Newell v. Commissioner of Social Security, 347 F.3d 541, 547 (3d Cir. 2003); Wilder v. Apfel, 153 F.3d 799, 802 (7th Cir. 1998). Plaintiff points to no such corroboration in the record.  The ALJ sought to direct the questioning at the hearing to the period around March 2005, so he cannot be faulted for failing to try to properly develop the record.  (See Tr. at 53, 57.)

likewise stated that while plaintiff's "ongoing health conditions of a deteriorating nature preclude any competitive employment at this time," plaintiff did "appear to be intellectual[ly] and academically competent."  (Tr. at 574.)

### 3.    Back Impairment

Plaintiff contends that her recent back surgery resulted from a severe physical condition that existed prior to March 31, 2005.  (Pl.'s Br. at 1.)  As plaintiff concedes, her back surgery occurred after the ALJ made his unfavorable decision; the ALJ cannot be faulted for failing to consider this evidence, which was not before him.  Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993).  Plaintiff contends that the surgery proves that she had a severe back problem that existed prior to the DLI.  (Pl.'s Br. at 2.)  It proves no such thing.  Plaintiff's initial application made no mention of a back impairment, and in a later pre-hearing submission she stated that her severe back problems started on March 31, 2008. (Tr. at 232.)  She told Dr. Kores in June 2008 that her back problems arose recently when she tripped over one of her cats.  (Tr. at 573.)  Plaintiff cites no portion of the record suggesting a severe back injury or impairment prior to March 31, 2005.

Plaintiff argues that the ALJ dismissed the explanatory evidence she submitted (Pl.'s Br. at 1), but she fails to cite any such evidence now; nor does she explain how this evidence shows the ALJ erred.  Plaintiff similarly contends that there is "overwhelming evidence of severe physical injury and severe mental abuse that caused her to [use] alcohol to self-medicate."  (Pl.'s Br. at 1-2.)  Again, however, she fails to direct my attention to any specific portion of the record or to develop any argument as to how the ALJ erred in his analysis of the record.  And, as discussed, the ALJ did not commit reversible error in seeking some objective evidence of disability during the relevant period.

Plaintiff claims that the "ALJ went out of his way to ignore and dismiss the prior explanatory evidence that was submitted." (Pl.'s Br. at 2.) But the ALJ need not produce a complete written evaluation of every piece of evidence, e.g., McKinzey, 641 F.3d at 891, and plaintiff again fails to tell me what evidence the ALJ ignored or how its proper consideration might affect the outcome, see Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

### 4.    Conclusion – Main Brief

Plaintiff concludes her main brief by arguing that the unfavorable decision is "outrageous. Here we have a lady who suffered severe mental abuse as a child as [set] forth in the records and then suffered physical injury at the hand of two spouses who she divorced. It is a sad day because this is claimant's last chance for SSD." (Pl.'s Br. at 2.) Generalized claims that the ALJ's decision is wrong or appeals to sympathy will not suffice. See, e.g., Cadenhead v. Astrue, 410 Fed. Appx. 982, 984 (7th Cir. 2011) (stating that a "generalized assertion of error is not sufficient to challenge an adverse ruling," and "undeveloped or unsupported contentions are waived"); Dutcher v. Astrue, No. 09–CV–1161, 2011 WL 1097860, at *9 (N.D.N.Y. Mar. 7, 2011) ("Appeals to sympathy and requests for more lenient standards for determining benefit eligibility must be directed to the elected branches of government."), adopted, 2011 WL 1042773 (N.D.N.Y. Mar. 22, 2011).

Plaintiff refers to the "new and material evidence submitted with regard to claimant's back injury," which she argues supports a reversal and a favorable decision. (Pl.'s Br. at 2.) However, plaintiff makes no argument for a sentence six remand for consideration of such

evidence, see Perkins v. Chater, 107 F.3d 1290, 1296 (7th Cir. 1997) (discussing the standard for remand under sentence six of § 405(g)), and, as noted, the correctness of the ALJ's "decision depends on the evidence that was before him," Eads, 983 F.2d at 817.[22]

## B.     Plaintiff's Reply Brief

### 1.     Failure to Comply with AC Remand Order

In her reply brief, plaintiff contends that the issue before the court is simple: Did the ALJ comply with the AC's remand order?  (Pl.'s Reply Br. [R. 22] at 2.)  However, even assuming, arguendo, that the ALJ erred in this regard, plaintiff provides no authority for the proposition that such an error provides an independent basis for reversal and remand.

The regulations state that the "administrative law judge shall take any action that is ordered by the Appeals Council," 20 C.F.R. § 404.977(b), but the cases hold that the "question whether the ALJ complied with the Appeals Council's remand order is not, in the final analysis, of independent importance.  The only question properly before [the court] is whether the ALJ's decision (which the Appeals Council chose to leave undisturbed) is supported by substantial evidence." Poyck v. Astrue, 414 Fed. Appx. 859, 861 (7th Cir. 2011); see also Yonek v. Astrue, No. TMD 09–2905, 2011 WL 1231154 (D. Md. Mar. 28, 2011) ("[T]he failure of an ALJ to follow the precise dictates of an Order of Remand from the Appeals Council does not automatically warrant a remand."); Fajardo v. Astrue, No. CV 08–01615, 2010 WL 273168, at * 3 (C.D. Cal. Jan. 14, 2010) ("[R]egardless of whether the ALJ fully complied with the Appeals Council's remand order, judicial review is limited to the question whether the ALJ's decision is supported by substantial evidence and reflects application of the correct legal standards."); Dishman v.

_____

[22]Nor does plaintiff point to any evidence supporting her contention that her back problem arose from pre-DLI spousal abuse.

Astrue, No. 4:08-cv-58, 2009 WL 2823653, at *10-11 (E.D. Tenn. Aug. 27, 2009) (collecting cases rejecting similar arguments); Brown v. Comm'r of Soc. Sec., No. 1:08–CV–183, 2009 WL 465708, at *6 (W.D. Mich. Feb. 24, 2009) ("Whether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision."); Bass v. Astrue, No. 1:06–cv–591, 2008 WL 3413299 at *4 (M.D.N.C. Aug. 8, 2008) ("The Court does not review internal, agency-level proceedings, and therefore will not address whether the ALJ complied with specific provisions of the Appeals Council's remand order."). Further, by declining plaintiff's second request for review in this case, the AC "implicitly found that its earlier remand order had been followed." Walker v. Astrue, No. 08-3666, 2009 WL 3160165, at *15 (E.D. La. Sept. 29, 2009).

Plaintiff argues that the ALJ should have held a new hearing on remand, but ALJs enjoy considerable discretion in deciding whether to hold additional hearings or collect more evidence, see, e.g., Nicholson v. Astrue, 341 Fed. Appx. 248, 254 (7th Cir. 2009); Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994), and plaintiff develops no argument that the ALJ abused that discretion in this case. Plaintiff contends that given "the new and material evidence that was submitted a *new hearing was absolutely necessary so that a new record could be made*." (Pl.'s Reply Br. at 3, emphasis in original.) Once again, though, she fails to tell me what that new and material evidence is. Nor does she develop any argument as to why new medical or vocational testimony was needed. She claims that such testimony was mandated by the AC, but the Council's order said only that the ALJ should obtain such testimony "if necessary" or "if warranted." (Tr. at 89.)

## 2. VE's Testimony Regarding Number of Jobs

Finally, plaintiff argues for the first time in the reply brief that it is unclear whether the

jobs identified by the VE existed between October 9, 2004 and March 31, 2005; she asks that the matter be remanded to answer this question. As indicated above, arguments first raised in reply are waived. Carter v. Astrue, 413 Fed. Appx. 899, 906 (7th Cir. 2011) (citing United States v. Lupton, 620 F.3d 790, 807 (7th Cir. 2010); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009)). In any event, plaintiff's lawyer could have asked the VE to clarify his testimony on this point at the hearing but failed to do so, see Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) (explaining that objections to a VE's conclusions may be forfeited if not challenged at the hearing), and in this court plaintiff presents no evidence, argument, or authority suggesting that the identified jobs – which the VE testified existed as of May 2007 (Tr. at 69) – did not also exist in substantial numbers during the relevant time, cf. Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) (finding the ALJ's error in failing to ask the VE if his testimony was consistent with the DOT harmless where the plaintiff failed to demonstrate an actual conflict). Therefore, plaintiff fails to establish a basis for remand on this ground.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 4th day of August, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge